Filed 5/15/15  In re S.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re S.M., a Person Coming Under the Juvenile Court Law. | |
| | D066498 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518024B) |
| v. | |
| J.M. et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant J.M.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant V.G.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent.

V.G. (mother) appeals from the order denying her reunification services and terminating parental rights to her daughter, S.M.,[1] who was born in January 2014. Her contention on appeal is that the juvenile court abused its discretion and thus erred when it denied her "changed circumstances" petition under Welfare and Institutions Code[2] section 388.

S.M.'s father, Jesus M. (father), also appeals the denial of his separate section 388 petition. Father does not assert any independent issues; instead, he joins in mother's opening brief and her challenge to the denial of the section 388 petition and the termination of parental rights. As we explain, we conclude the court properly exercised its discretion in denying the section 388 petitions and terminating parental rights. Affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

In or about 2009, mother "relinquished her parental rights" to her two older children. In 2013, mother and father failed to reunify in a prior dependency case with their other daughter, B.M., after both mother and B.M. tested positive for drugs at B.M.'s

---

[1] Minor's counsel filed a letter brief joining in the arguments and position of the San Diego County Health and Human Services Agency. (See Cal. Rules of Court, rule 8.200(a)(5).)

[2] All further statutory references are to the Welfare and Institutions Code.

2

birth.  In early January 2014, S.M. was born.  At the time of S.M.'s birth, both mother and father were incarcerated.

Shortly after her birth, the agency filed a petition on S.M.'s behalf alleging she was a child described by section 300, subdivision (b) because of the extensive and pervasive drug use of mother and father.

Mother admitted to a social worker of the San Diego County Health and Human Services Agency (agency) to the daily use of heroin while pregnant with S.M., until her arrest in November 2013.  Mother also did not receive prenatal care before her incarceration.

Mother reported that when she gave birth to S.M., she had been addicted to heroin for about six years; that she typically injected two grams of heroin a day; that if she did not take that amount, she would become severely ill; that to support her drug habit, mother would steal; and that as a result of repeatedly stealing to support her addiction, mother was arrested 10 times between October 2008 and November 2013.  In 2013, mother had two arrests for burglary and one felony conviction for burglary.

Mother further reported that father also was an addict; that he provided her with heroin; and that their relationship began in 2008 and they were together "on" and "off" since then because they would "argue" a lot, particularly when under the influence. Mother reported she and father married in 2011.  Father, however, reported they were married in 2009.  Mother denied there was any domestic violence in their relationship

3

and stated father was a "great father" despite his extensive criminal history and heroin addiction.

The record shows father's criminal history dates back to 1997, when he was arrested for attempted murder. In 1998, father was convicted of attempted murder and sentenced to five years in prison. In 2003, father was arrested for possession of a controlled substance and sentenced to 80 months in prison. Father was arrested multiple times while incarcerated. Since 2009, father has been arrested nine times for possession and/or being under the influence of a controlled substance, with his last arrest being in November 2013, shortly before S.M. was born.

Mother reported that she had not had stable housing for the last six years, since the onset of her addiction; that she had not obtained any baby supplies for S.M.; and that addiction to heroin caused her to lose her other three children. Mother reported that over the last two years of her addiction, she began to share needles with other addicts, which the agency noted placed mother "at high risk for contracting blood[-]borne illness."

In late February 2014, the court made a true finding on the petition, removed S.M. from the custody of mother and father and ordered her placed in the home of relatives, where S.M. had been residing with her full biological sibling, B.M., since S.M. was released from the hospital shortly after her birth. Mother was denied reunification services pursuant to section 361.5, subdivision (b)(10) and (11).[3] Father was denied such

_____

3    Subdivision (b) of section 361.5 provides: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (10) That the court ordered termination of reunification services for any siblings or half siblings of the child

4

services pursuant to subdivision (b)(12) and (13) of this same statute.[4]  The court set a section 366.26 hearing to select and implement a permanent plan for S.M.

The agency in its section 366.26 report recommended that parental rights be terminated and that a permanent plan of adoption be ordered for S.M.  That report noted that S.M. remained placed with her relative caregivers; that the caregivers wished to adopt S.M. and raise her along with B.M.; and that S.M. was doing well in her placement, with no development concerns.  Meanwhile, mother (but not father) had been released from custody into an inpatient drug treatment program, as required by the conditions of her parole.

---

because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian. [¶] (11) That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent."

[4]     Subdivision (b)(12) and (13) of section 361.5 respectively provide:  "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (12) That the parent or guardian of the child has been convicted of a violent felony, as defined in subdivision (c) of Section 667.5 of the Penal Code. [¶] (13) That the parent or guardian of the child has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible."

5

The section 366.26 report noted mother was then having weekly visits with S.M. Father remained in custody; he did not respond to correspondence from the agency and did not request any visitation with S.M.

The section 366.26 report included descriptions of four visits between mother and S.M. between mid-April and early June 2014 that were observed by an agency social worker. Each visit took place at mother's inpatient drug treatment facility. That report noted that each of these visits, as well as others, went "without incident"; that mother acted appropriately during the visits; that mother asked questions about S.M. and showed love and affection toward S.M.; and that S.M. tended to cry a lot during the visits and was hard to console, which S.M.'s caregivers noted was "not typical behavior" for S.M.

The agency social worker in the section 366.26 report recommended a permanent plan of adoption for S.M. In making this recommendation, the agency "examined the parent-child relationship against the benefits of adoption. Based on the fact that [father] has been incarcerated for the majority of the dependency case and that [father] has not responded to the correspondence of [the agency social worker] as to visitation, one can infer that a parental relationship with [S.M.] does not exist. While [mother] eagerly participates in visitation, brings [S.M.] gifts and items of clothing, [S.M.] cries for the majority of the time during visitation and [mother] has difficulty consoling her. In addition, [S.M.] does not display signs of emotional distress in separating from [mother]. [S.M.] has been out of her mother's care since birth and has not had her needs consistently met over time by [mother]. Throughout [S.M.]'s lifetime, [mother] has

6

exposed [S.M.] to unhealthy elements (heroin in utero), and criminal activity resulting in incarceration and her inability to develop a parental relationship with her daughter.

"In evaluating the relationship between [mother and S.M.], it does not appear to outweigh the benefits of adoption.  [S.M.] was removed at birth based on her parent[s'] long history of drug use and prior failure to reunify.  Developmentally, [S.M.] is in a critical stage in which a secure parental figure is necessary for her emotional well-being. The benefit of adoption for [S.M.] would mean stability in a placement where she can continue to thrive, have her daily needs met, enjoy the benefit of being emotionally supported, and not be exposed [to] substance abuse and criminal activity.  [S.M.] would remain with relatives and have the continued support of extended family.  [S.M.] is also placed with her sibling, [B.M.], who has been adopted by the same relative caregivers. [Mother] and [father] have not shown, over time, that they are capable of meeting [S.M.]'s needs on a consistent basis, nor that there is a likelihood that they could do so.

"Therefore, based on the evaluation of the parent-child relationship against the benefits of adoption, the [agency] is respectfully requesting the Court to terminate parental rights and to order a permanent plan of adoption."

Mother in late July 2014 filed her section 388 petition.  In her petition, mother sought a modification to the court's previous order denying her reunification services and requested services up to the date of her 12-month permanency review hearing.   In support of her petition, mother contended that granting her reunification services was in the best interest of S.M. because mother was then "clean and sober" and had "completed

7

an inpatient substance abuse treatment program." Mother also contended that S.M. would "have a mother with strong and effective parenting skills because [she] has completed two parenting classes, and [she] has gained the insight needed to handle difficult parenting situations through her therapy." The court granted an evidentiary hearing on mother's petition.[5]

In connection with the combined section 388 evidentiary hearing and section 366.26 selection and implementation hearing, the agency submitted an addendum report in which the agency recommended against granting the section 388 petitions of mother and father. In the addendum, the agency noted that there was no showing of "changed circumstances" by either mother or father; that although mother was "making progress" in treatment, mother was still in the "'initial stages of recovery' with a long road ahead of her" as a result of her six-year-long heroin addiction; that although the agency commended mother's efforts, mother herself admitted she was unable to consider her plans after she left residential treatment because she could not "'really look that far into the future'"; and that because mother had chosen to remain at the inpatient recovery facility, it would be difficult for mother to "show that she could be successful living on her own, making daily choices in recovery, exposed to triggers, implementing her relapse prevention plan, over time." Thus, the agency concluded in its addendum that mother's

---

[5]    The record shows father also filed a section 388 petition, and the court likewise granted an evidentiary hearing on his petition. As noted, father has not submitted any briefing but instead has in this appeal joined in mother's opening brief. As a result, we deem it unnecessary to discuss the substance of father's section 388 petition.

circumstances were "slowly 'changing'" but have "not 'changed' to the degree to warrant reunification services, with a baby, at this early stage in her recovery."

As to father, the addendum noted that father for about three weeks had been living in a sober living facility per the conditions of his probation; that father had one supervised visit with S.M. since his release; and that father wanted S.M. to be in mother's care. The addendum noted that after the one visit, father failed to communicate with the agency, and, thus, it had no knowledge of father's then current circumstances, including his progress in services. In any event, the agency noted that, like mother, father had "a long road ahead of recovery" as he was just released from custody on drug-related charges and he had an "extensive history of violent and drug related charges."

The addendum also found the best interest of S.M. warranted denial of both section 388 petitions. The agency in that report noted the problems of mother and father that led to S.M.'s dependency were serious, as mother had been a heroin addict for six years, while father for 10, and, as a result, they lost their custody and parental rights to their other child, B.M.

Further, the agency noted there was no bond between S.M. and father, as he had been incarcerated for the majority of the dependency case and had failed to respond to the agency's efforts to provide additional supervised visits with S.M. after just one visit.

As to mother, the agency again noted that S.M. had been out of mother's care since her birth; that S.M. displayed no signs of emotional distress when separated from mother after visits; that S.M. cried during a majority of the visits with mother and mother had a

9

difficult time consoling S.M.; and that mother had exposed S.M. to unhealthy elements while pregnant including mother's daily intravenous heroin use during the first six months of her pregnancy. As such, the agency concluded in the addendum that the relationship between mother and S.M. did not outweigh the benefits of adoption.

Finally, the agency noted that the problems of the parents that lead to dependency, namely long-term heroin addiction and myriad criminal arrests and convictions, were not easily removed or ameliorated, and that both mother and father were, as noted, in the very early stages of recovery. For this additional reason, the agency concluded in its addendum that the best interest of the child supported a denial of both section 388 petitions.

The combined hearing took place in mid-August 2014. The court received into evidence the agency's reports, including the addendum to the section 366.26 report, and various exhibits provided by both mother and father in support of their respective section 388 petitions.

Father testified at the hearing that he had been released from custody for about a month; that he was then undergoing treatment through the "drug court" and attending Narcotics Anonymous (NA) meetings three times a week; and that he was residing in a sober living arrangement. Father testified that he had been sober for about four months and that unlike the past when he tried to quit, he was not "crav[ing]" drugs anymore. Father indicated that he had one visit with S.M. since his release from custody; and that he hoped to visit S.M. at least once a week.

10

On cross-examination, father testified he would be able to stay sober without a treatment program and without attending any NA or similar 12-step meetings, despite the fact father admitted that he used drugs "off and on all of [his] adult life" and that within the last 10 years his drug of choice was heroin.

Mother testified that she was then living in a residential treatment facility for addiction to heroin and "crystal"; that after she got out of custody, the court ordered her to enter the facility for drug treatment; that she then had been living in the facility for about four months; and that, although she had completed the requirements of the program, she continued to live in the facility and attend groups dealing with anger management, parenting and relapse prevention. Mother also testified she was attending NA meetings five times a week, speaking with her sponsor on a "daily basis" and participating in therapy.

Although mother completed her inpatient treatment program, mother testified she continued to live at the facility because at her "phase" of recovery she still needed to find work and a stable living environment, and, thus, the facility allowed her to stay "for [her] safety" and to ensure she stayed sober. Mother testified she had just found part-time employment but had not yet started work.

Mother testified she has had supervised visits with S.M. once a week for an hour, and there was a strong bond between her and S.M. She also testified that she has been sober since her incarceration in November 2013 and that this was her longest period of sobriety in the last six years. Mother testified her motivation to stay sober was her desire

11

not to lose S.M. With a job, mother believed she was one step closer to living on her own.

On cross-examination, mother identified certain "triggers" that led to her drug use, including anger, people and places. Mother denied father was a trigger for her because mother said she then did not have any relationship with him. Mother noted her own mother also was in treatment for substance abuse. Each weekend mother took about a three-hour bus ride to visit her own mother.

Mother stated that in between visits with S.M. she did not call the caregivers to check on S.M. Mother also never offered to travel to the caregivers' home to have additional visits with S.M. Mother did call the agency social worker between five and 10 times, however, to ask how S.M. was doing. Mother testified that she had just begun working on "step one," which was "admitting that you're powerless over your addiction and that your life has become unmanageable."

A counselor from mother's inpatient treatment facility testified that mother had participated in two, 90-day treatment plans while at the facility; that mother was then close to living in "transitional housing" at the facility; and that although mother had completed all the requirements of the facility, she was still living in the facility because the longer mother stayed, the better her chances were of "success" in treatment.

The counselor also testified mother had participated in and/or completed among others a "parenting" group, a "relationship" group, and a "relapse" group. The counselor noted that the facility drug tested mother on admission to the program and thereafter four

12

times a month or upon suspicion. In each instance, mother had tested negative for drugs. On cross-examination, the counselor testified mother previously recognized father as one of mother's triggers.

The agency social worker who prepared both the section 366.26 and addendum reports testified at the combined hearing that she observed about nine visits between mother and S.M.; that mother acted appropriately during the visits and asked for additional visits with S.M.; and that in the first few visits, S.M. cried for most of the visit and it was "very hard" for mother to console S.M. However, the social worker noted that S.M. had not cried in her most recent visits with mother, although S.M., according to the social worker, did not make a lot of eye contact with mother during their visits. The social worker described mother's behavior during the visits as being neither "overly excited" when they began nor "overly sad" when they ended.

The agency social worker also attended the one visit between father and S.M. The social worker testified father was happy to see S.M. and the child displayed no distress at the end of the visit as a result of separating from father.

The agency social worker testified that she observed S.M. in the relative caregivers' home and that, in contrast to visits with mother, S.M. was "generally smiling," "more alert" and did not cry. The social worker noted that S.M. appeared "more cautious" when visiting with mother; that S.M. looked to the caregivers and even the social worker during the visits; and that when separated from mother at the end of the visits, S.M. did not cry or attempt to hold on to mother. The social worker noted that in

13

visits with mother, S.M. "look[ed] to be a child that's gaining more confidence in someone they're meeting," as opposed to how S.M. acted when she was in the home of her caregivers, where the social worker observed S.M. was "more animated" and looked to be "comfort[able] . . . with someone that [she] actually kn[e]w." Thus, according to the social worker, S.M. viewed her mother as a "friendly person" but not as parent.

The agency social worker noted mother had taken positive steps to address her addiction but characterized mother as being in the "early" stage of recovery. The social worker noted mother still appeared to be in some relationship with father, as the social worker had observed mother and father holding hands and hugging after a recent court hearing. The social worker stated this factored into her assessment mother has not yet changed circumstances because mother and father used to do heroin together, father supplied mother with the drug and father was one of mother's "triggers."

The agency social worker testified that S.M.'s caregivers initiated a home study to adopt S.M.; that there were no impediments when they adopted B.M., S.M.'s biological sister; and that the caregivers had not criminal history or history with the agency.

The relative caregiver, F.G., testified mother had called only once to check on S.M. since her release from custody and that call had come during the first week of mother's release. He further testified that he attended most of the visits between S.M. and mother; that initially the visits were "very hard" for S.M., as she was "very uncomfortable" and cried through most of the visits with mother; and that there was a

14

"big difference" between S.M.'s behavior during the visits with mother and her behavior in the caregivers' own home.

F.G. testified that during visits with mother, S.M. was "just plain" and "not very alive and interactive," but in their home S.M. was "very expressive" and "alive." He also testified mother at the last visit did not ask whether S.M. was then crawling and only did so when someone else asked mother about crawling and mother said she was not sure.

F.G. testified that in addition to B.M., he and his wife have a five-year-old daughter; that it was a "joy" to watch S.M. interact with B.M. and their five year old; and that S.M. clearly loved her "older sisters" and they in turn "love[d]" and "adore[d]" S.M. F.G. stated their family would like to adopt S.M., whom he referred to as "his daughter."

At the conclusion of the hearing, after considering the documentary evidence as well as the testimony of the witnesses, the court denied the father's section 388 petition, finding no "proof by preponderance of the evidence that there has been a change of circumstance that makes the change of orders in this case in the best interest of [S.M.]" In making this finding, the court found father "has a lengthy history of a severe heroin addiction. That has been demonstrated throughout the documents as well as the testimony in this case. He has recently been released from custody. He's been in and out of custody the majority of his adult life. He's been in treatment for one month, and is currently in the drug court program in sober living based upon his criminal conviction and probationary grant which has ordered him to attend those programs. Father lacks insight at this time and does not believe that he is an addict. And his recovery is at a very

15

early stage. Based upon the evidence presented regarding father's 388, there has not been proof by preponderance of the evidence of change in circumstances.

"I also find that based upon father's de minimis relationship with [S.M.], although he says he loves her, and I have no reason to doubt that, that he does not have a relationship with [S.M.] He visited her once since being released from custody, and that is the only visit he had because he's been incarcerated during the entire [time] that she has -- from birth to present. Father's 388 petition fails on both prongs."

The court next denied mother's section 388 petition. In so doing, the court commended mother for participating in treatment and recognized the facility where mother was living appeared to be a "good fit" for her. Nonetheless, the court noted mother also was in the early stages of treatment: "But by my calculation mother has been in the program since March 23rd, and today is August 13th. We are really looking at about five months of mother's treatment. I understand that mother alleges sobriety for a lengthier period of time, November 2013, but in terms of the actual treatment to narcotics and more specifically heroin, narcotics for about half of her life and heroin for the last six years, there has been a beginning stage of treatment. She's probably about half way through. But the issue is, even the therapist from -- the counselor, rather, from [the facility] indicated that truly to show and to have success at recovery the program is at least one year in length and includes continued groups, therapy, and sponsorship, and going through the steps one through 12. Mother is at step one, and moving into a social living environment and then moving into an independent environment which then shows

16

a true change of circumstance that one, such as mother, who has the history of addiction that she has, has changed her circumstance that she can remain in a stable and sober environment on her own without the structure and daily oversight of the residential treatment program she's in.

"So although I think mother is in the process of changing her circumstances by participating . . . in the . . . treatment program, I don't find there has been proof by preponderance of the evidence that her circumstances have changed.

"I also rely on the fact that there is . . . quite a history that mother has had with her previous children. In this particular case, with respect to [S.M.], mother indicated she did not receive prenatal care until she was arrested November 1, 2013. She admitted using heroin while she was pregnant for the first six months up until the point she was arrested, and then at that point she remained in custody until she gave birth to [S.M.] in January 2014. She has four children. The two older children . . . were removed from her care. Parental rights and services were terminated, and there is legal guardianship with maternal aunt. And then she relinquished her parental rights through family court approximately five years ago. We also know that mother failed to reunify with [B.M.], and her parental rights were terminated. And [B.M.] is in the process of being adopted by the current caregiver who is also interested in adopting [S.M.]

"In looking at the history of mother's interaction with her children who are older than [S.M.], her failure to reunify with those children, her failure to take advantage in those services, in those cases, and then looking at this particular case in such an early

17

stage of mother's treatment . . . , I do not find that there has been a change of circumstances. Circumstances may be changing in that mother is at this point having lost three -- four of her children, including [S.M.], is maybe at a place in her life where she realizes that the addiction has taken quite a toll on her personal life and she's lost four children as a result of it. But with respect to a change of circumstance, I don't find that her circumstances have changed based upon the information before the court."

The court also found that it was in S.M.'s best interest to have permanency and stability and that mother's best interests were no longer the court's focus. The court found it was in S.M.'s best interest to remain with her current caregivers, who were interested in adopting S.M. just like S.M.'s older biological sister, B.M. The court noted that S.M. had been living with the relative caregivers since the third day she was born and that S.M. felt safe in that arrangement and had the opportunity for "permanence and a lifelong set of parents."

After denying the section 388 petitions of the parents, the court found by clear and convincing evidence that S.M. would be adopted, either by her relative caregivers or by 105 families that have approved adoptive home studies who met S.M.'s criteria. The court further found by clear and convincing evidence that none of the circumstances listed in section 336.26, subdivision (c) applied to make termination of parental rights detrimental to S.M. The court thus terminated parental rights and declared a permanent plan of adoption for S.M.

DISCUSSION

I

A.  *Guiding principles*

Section 388 permits any person having an interest in the child to petition for a hearing to change, modify, or set aside any court order previously made on grounds of change of circumstance or new evidence.  (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.)  To prevail, the petitioner must demonstrate by a preponderance of the evidence that new or changed circumstances warrant a change in the prior order and that changing the order will serve the child's best interests.  (*In re S.J.* (2008) 167 Cal.App.4th 953, 959; *In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.)

After an evidentiary hearing, such as what occurred in the instant case, we review the denial of a petition under section 388 for abuse of discretion.  (*In re S.R.* (2009) 173 Cal.App.4th 864, 870; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)  "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319; see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.)

The petition to modify a prior order must include (1) a showing of changed circumstances, and (2) the requested modification must be in the child's best interests. The burden is on the petitioning party to show both of these elements.  (*In re Casey D.*

(1999) 70 Cal.App.4th 38, 47.) In determining whether a section 388 petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188–189.)

Moreover, the best interests of the child are of paramount consideration when a modification petition is brought—as it was here—*after* termination of reunification services. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) In assessing the best interests of the child at this juncture, as the court here correctly noted we look not to the *parent's* interests in reunification but to the needs of the *child* for permanence and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

Thus, a "petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) "[W]hen a child has been placed in foster care because of parental neglect or incapacity, after an extended period of foster care, it is within the court's discretion to decide that a child's interest in stability has come to outweigh the natural parent's interest in the care, custody and companionship of the child." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419.)

Indeed, the "'escape mechanism'" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528) provided by section 388 after reunification efforts have ceased is only available when a parent has "*complete[d] a reformation*" before parental rights have been

20

terminated. (*Ibid.*, italics added.) This is because, if a parent's circumstances have not changed sufficiently to permit placement of the child with that parent, reopening reunification "does not promote stability for the child or the child's best interests" when the child is otherwise adoptable. (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.)

B. *Analysis*

1. Father

Turning first to father, the record contains ample evidence supporting the finding that father had a lengthy history of a severe heroin addiction; that at the time of the petition, father had been out of custody and in treatment for *only* about a month; that he had been in and out of custody the majority of his adult life and his convictions included attempted murder; and that since 2009, he had been arrested nine times for possession, and/or being under the influence, of a controlled substance.

What's more, the record shows father testified he could stay sober without a treatment program and without attending NA or similar 12-step programs, despite the fact he had used drugs for most of his adult life, including heroin over the last 10 years. Father also told agency workers shortly before the hearing that he believed S.M. should be placed in the care of mother, even though mother also had been a heroin addict for the last several years until her incarceration in November 2013. Finally, the record shows father already had lost a child, B.M., through dependency.

In light of this record, we conclude the court acted well within its discretion when it found father did not carry his burden of proof to show "changed," as opposed to merely

21

"changing," circumstances with respect to his section 388 petition seeking a modification of the order denying him reunification services.

We also conclude the court properly exercised its discretion when it found father also did not carry his burden to show it was in S.M.'s best interest to grant his section 388 petition. The record shows that S.M. was adoptable—a finding not challenged on appeal; that S.M. was living with her biological sister, B.M., in the home of relative caregivers who also desired to adopt S.M.; that S.M. was thriving in her placement; and that S.M. was at a critical stage of development and needed consistency and secure parental figures for her emotional wellbeing. In light of this additional evidence, when considered in connection with the evidence summarized *ante*, we conclude the court properly denied father's section 388 petition.

2. Mother

Like the juvenile court, we commend mother for her efforts in tackling heroin and drug addiction. Nonetheless, as a court of review our role is to determine whether the court abused its discretion when it found mother's circumstances were merely "changing," but not yet "changed," for purposes of her section 388 petition. On this record, we find no such abuse.

Indeed, the record shows that up until her incarceration in November 2013, mother had been a heroin addict for six years, including during six months of her pregnancy with S.M.; that mother typically injected two grams of heroin a day; that mother had used drugs since she was 19 years old; that mother had been unsuccessful in treatment before

22

her current placement; that mother was arrested 10 times between October 2008 and November 2013; that mother had not had stable housing for years; and that because of her addiction, mother already had lost B.M. through the dependency system and had relinquished her rights to two other children.

Moreover, the record also shows despite the long history of heroin addiction of father, his extensive criminal background (including violent felonies) and his providing mother with heroin during the course of their relationship, mother still reported to an agency social worker that he was a "great father" to their children. Such evidence also supports the finding that mother was in the early stages of recovery.

In light of this evidence, which is substantial, we conclude the court properly exercised its discretion in denying mother's section 388 petition. (See § 388, subd. (a)(1); see also *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47.)

Moreover, we also conclude mother did not satisfy her burden to show it was in S.M.'s best interest to grant mother's section 388 petition and offer mother reunification services. As noted, the paramount consideration at this stage of the dependency proceedings is the need of S.M. for permanence. The record shows that S.M. had lived with her relative caregivers since she was three days' old; that she also lived with her biological sibling, B.M., who was in the process of being adopted by the caregivers; and that the caregivers were also interested in adopting S.M. In addition, the record shows that S.M. was thriving in her placement and that S.M. was at a critical stage in her development, where stability was paramount.

23

In light of this additional evidence and the evidence already summarized, we conclude the court also properly exercised its discretion when it found it was not in S.M.'s best interests to grant mother's section 388 petition and offer mother reunification services.  (See *In re Jasmon O.*, *supra*, 8 Cal.4th at p. 419; cf. *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1417 [noting juvenile court erred in failing to offer a mother an evidentiary hearing before summarily denying her section 388 petition because three declarations attached to the petition supported a prima facie finding that her circumstances had changed and that the only negative factor supporting termination of services was her failure to find stable housing].)

## DISPOSITION

The order denying the section 388 petitions and terminating the parental rights of mother and father is affirmed.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

McINTYRE, J.